People v Wright (2025 NY Slip Op 05869)

People v Wright

2025 NY Slip Op 05869

Decided on October 23, 2025

Court of Appeals

Rivera, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 23, 2025

No. 70 

[*1]The People & c., Respondent,
v
Jason Wright, Appellant.

Matthew Bova, for appellant.
Elizabeth T. Schmidt, for respondent.
Ira M. Feinberg, for intervenor Hon. Letitia James, New York State Attorney General.
The Innocence Project et al., American Psychological Association, amici curiae.

RIVERA, J.:
Defendant challenges his conviction by jury verdict of assault in the first degree (Penal Law § 120.10 [1]) and related offenses, and his sentence as a predicate violent felony offender to 20 years' incarceration. We conclude that defendant's challenge to his conviction fails because, even assuming the trial court erred for the reason defendant argues, that error was harmless, as the trial evidence against him was overwhelming and there is no reasonable possibility that the error contributed to his conviction. On the other hand, defendant's challenge to his sentence has merit. The court denied defendant his statutory right to personally controvert the prosecution's predicate felony allegations when it refused to consider his specific challenge and instead accepted defense counsel's concession of the issue. Since the court summarily declared defendant a predicate felon and imposed an enhanced sentence, we modify and remit to Supreme Court, where defendant may controvert the predicate felony allegations and have an opportunity to assert his separate constitutional challenge to the Criminal Procedure Law's predicate felony sentencing scheme.
I.
Defendant Jason Wright was charged with attempted murder, first-degree assault, and related offenses, stemming from allegations that he shot and injured two people on a Manhattan street. There was one eyewitness who [*2]identified defendant as the shooter and several other witnesses whose observations and auditory recollections implicated defendant, including two who stated that defendant confessed to them later that day that he shot someone.
As relevant to this appeal, defendant challenged the eyewitness's prospective in-court identification of him as the shooter, on the grounds that the police previously subjected her to a suggestive identification procedure and that she failed to subsequently identify him in a non-suggestive lineup. According to the evidence at the pre-trial suppression hearing, while a detective was escorting defendant in handcuffs to the lineup room in the District Attorney's office three days after the shooting, he saw the eyewitness waiting in the reception area. Within a second or two of stepping into the reception area, the detective turned around with defendant and waited outside until the eyewitness was moved away. Later that day, the eyewitness did not identify defendant at the six-person lineup. When asked if she recognized anyone, the eyewitness responded, "[n]o, he's not here. I thought I may have seen him this morning, but maybe you switched him out. One of the middle guys looked nervous." The court concluded that the pre-lineup incident in the reception area was unduly suggestive and ordered an independent source hearing to determine whether the eyewitness should nonetheless be permitted to make an in-court identification of the shooter at trial.
The court held the independent source hearing during trial, outside of the jury's presence. The eyewitness testified at the hearing that on the day of the shooting, she was sitting in a parked car under bright and sunny conditions when she saw two men arguing about 10 feet away. She described one of the men as heavyset, approximately 5'10" or 5'9" in height, with a curly afro, and wearing a red shirt, black jacket with a zipper, black jeans, and no hat. The other man was wearing a red sweatshirt and baseball cap, was slim, and was similar in height to the first man but with a lighter skin tone. After a few minutes, the eyewitness saw the heavyset man start shooting at the other man from the middle of the street, approximately eight feet away from her. The shooter then turned and walked away. Three days after the shooting, the eyewitness went to the District Attorney's office to view a lineup. While sitting in the reception area, she saw a handcuffed man for a second or two. Then, before the lineup, the eyewitness told a detective that the handcuffed man "is him. I'm 100 percent sure that is him." Later that day, the eyewitness did not identify defendant in the lineup.
Based on this evidence, the court concluded that the prosecution met their burden of showing an independent source, and it permitted the prosecution to ask the eyewitness to make an in-court identification of the shooter. The court found that the eyewitness had a clear opportunity on a bright and sunny day to observe defendant from eight feet away in her car, and for a couple of minutes. It also found that the eyewitness described defendant's physical build consistent with testimony already heard at trial from other witnesses. Additionally, the court noted that the eyewitness's testimony that defendant was wearing a zippered jacket was corroborated by video, as well as a zipper that the police found at the scene.
II.
At defendant's jury trial, the eyewitness's testifimony tracked her testimony at the independent source hearing and she identified defendant in court as the shooter. She added that the shooter never took the gun out of his jacket pocket, and that after she heard the gunshots, she saw smoke rising from the pocket. The prosecution's other evidence at trial included testimony from the two victims. One victim—the man who argued with the shooter—testified that on the day of the incident, he was wearing a red jacket and baseball cap. He saw a fight break out in front of a deli, and while trying to break it up, he punched a man, whom he identified in court as defendant, in the face. The victim knew defendant and testified that they previously had "a good rapport." Defendant followed the victim around the corner, and they argued for 10 to 15 seconds. The victim heard someone call his name, and he turned and began to walk away from defendant. As the victim reached the corner, he felt a burning sensation on his side and realized he had been shot.
The second victim testified that she saw two men, one of whom she identified in court as defendant, arguing on the street. She observed that defendant had a bloody lip and was wearing black pants, a plaid maroon shirt, and a black jacket. The second victim turned around and walked away because she was worried that the men would start a physical fight. She then "heard these two loud pops," felt an impact on her knee, and realized she had been shot.
The prosecution called multiple other witnesses to testify about their recollections of the incident. These witnesses testified consistently that they observed the argument between two men, and that one of them was Black, heavyset, and wearing a black jacket and red shirt. Several witnesses also heard the gunshots around the time of the argument. The two witnesses who called 911 similarly described the shooter as the man wearing a black jacket and [*3]red shirt. Another witness testified that he heard an argument between two men followed by three gunshots. When he turned toward the men, he saw the shooter—a man with a "stockier build" wearing a red shirt and a jacket—walk away with the gun. The witness got a "good look" and could see "traces of smoke" rising from the gun.
One of defendant's acquaintances testified that he and defendant traveled to Manhattan together on the day of the incident. The acquaintance saw the initial fight break out in front of the deli and the first victim punch defendant. After defendant and the first victim turned the corner, the acquaintance heard two gunshots and left the area. Defendant met the acquaintance outside his home later that day and confessed "that he possibly coulda shot somebody," while demonstrating the movement of shooting a gun from his jacket pocket. The acquaintance's girlfriend testified that defendant told her on the day of the incident that he shot someone and that afterward, "his pockets were smoking."
The prosecution also presented non-testimonial evidence. They showed the jury surveillance video taken from outside the acquaintance's home. The video depicts two men, both dressed in black, standing and talking, while one of the men appears to display a gun. The prosecution also submitted DNA test results from a zipper the police found at the scene, which a DNA analyst testified was "18.7 billion times more likely" to include a DNA mixture from defendant and one unknown person than from two unknown persons. The prosecution provided cell site records indicating that defendant was in the area of the crime scene around the time of the shooting. Finally, the prosecution presented a compilation of surveillance videos from the street where the shooting occurred and the surrounding area. The compilation does not depict the shooting, but it shows two men arguing, one of them wearing a black jacket and red patterned shirt. The street is relatively empty, and the compilation does not show anyone else wearing clothes similar to defendant's, or anyone else who could plausibly have been the shooter.
The jury deadlocked on the top charge of attempted murder and Supreme Court declared a mistrial as to that charge. However, the jury convicted defendant of various counts of assault, attempted assault, and criminal possession of a weapon.
III.
In advance of defendant's sentencing, the prosecution filed a predicate felony statement alleging that defendant was convicted of a violent felony over 20 years earlier. The statement further alleged that defendant's subsequent terms of incarceration sufficiently tolled the 10-year lookback period to encompass the prior conviction.
At the sentencing hearing, the court reviewed the plea and sentencing minutes from defendant's predicate conviction and determined that "there is no constitutional objection that . . . would be valid as to the actual predicate conviction." However, the court noted the timing of defendant's prior conviction. In response, the prosecution summarized the terms of incarceration that they alleged were sufficient to toll the 10-year lookback period with approximately three months to spare. The prosecution's tolling calculation included 196 days' incarceration at a New Jersey facility between 2008 and 2009.
The court asked defense counsel if they wished to be heard, and counsel responded, "not on this matter." Defendant immediately interjected, "[y]es, I controvert on that." The court ignored defendant's challenge to the predicate felony statement allegations and concluded that the prosecution established the required tolling period. It then moved to counsels' arguments on sentencing. Defendant continued to object to the proceeding and the court's finding that he was a second violent felony offender. Still, the court refused to hear defendant's challenge and threatened to remove him from the courtroom if he continued to press the point:
"THE COURT: [Prosecution], I will hear you on sentence. Defendant is adjudicated a violent predicate felon.
"THE DEFENDANT: Excuse me, I don't understand.
"THE COURT: Sir, if you have questions, ask your lawyer. Go on.
"[PROSECUTION]: Your Honor, the defendant stands before you convicted of one—
"THE DEFENDANT: But—
"THE COURT: I suggest that you listen to [the prosecution].
"[DEFENSE COUNSEL]: May I have a moment, [defendant] is asking me what is going on.
"THE COURT: This defendant has been disingenuous with the Court, he has repeatedly used that particular mantra, which I find to be insincere, this defendant knows exactly what is going on. We are moving to sentence, he has been adjudicated a violent predicate felon.
"THE DEFENDANT: They have not proven it, listen, listen, no—
"THE COURT: Sir.
"THE DEFENDANT: First of all, the tolling, the tolling—
"THE COURT: Sir, you are close to being removed from this courtroom again.
"THE DEFENDANT: The tolling is incorrect and they cannot use the Atlanta County Justice Facility tolling.
"THE COURT: Sir, I heard your lawyer on this issue, I will not hear further from you. I suggest that you reserve what you have to say in connection with sentence.
"THE DEFENDANT: With 70.04[ ] which she cited, the tolling is wrong on all of that."
After listening to counsel's arguments on sentencing, the court asked defendant if he wished to be heard. Defendant again argued that he was not a predicate felon, but the court refused to consider his claims:
"THE DEFENDANT: This case is well over two years old. From the onset I was being persecuted as if I was a predicate violent felon, okay. . . .
"But the reality is that I am not a predicate violent felon, the prosecutor made several statements, several, now that the case is well over two years old but yet statement after statement this year here is an amended statement that I was not given a chance to controvert, we just came in today, every other time you asked me did I want to controvert, why not today? . . .
"So if we look at from May 26, 1997 to November 13, 1997, it is tolled as 171 days.
"THE COURT: Sir, I will hear what you have to say, but you might consider saying something with respect to what sentence you should receive.
"THE DEFENDANT: Right, this all has to do with this.
"THE COURT: I am not going to tell you what to say, I am just telling you that this is the stage of the proceedings we are at, you have been adjudicated a violent predicate felon, that is done.
"THE DEFENDANT: But it should not be.
"THE COURT: Now I would like you to address, if you would like to, what kind of a sentence I should impose on a violent predicate felon, which is what you are, I have ruled as a matter of law.
"THE DEFENDANT: I have a question on that. How can you rule that as a matter of law if we did not go through this?
"THE COURT: Sir, I am not answering your questions."
The court sentenced defendant as a second violent felony offender on the first-degree assault count to 20 years' incarceration and an additional five years' post release supervision (PRS), concurrent to 15 years' incarceration and five years' PRS on the remaining felony counts. Had defendant instead been sentenced as a first violent felony offender, his minimum sentencing exposure would have been five years' incarceration and 2½ years' PRS (see Penal Law §§ 70.02 [3] [a]; 70.45 [2] [f]). Defendant's predicate status raised his minimum exposure to 10 years' incarceration (Penal Law § 70.04 [3] [a]).
The Appellate Division affirmed Supreme Court's judgment, rejecting defendant's challenges to his conviction and sentence (see 215 AD3d 601 [1st Dept 2023]). A Judge of this Court granted defendant leave to appeal (see 41 NY3d 986 [2024]).
IV.
Defendant attacks his conviction and requests a new trial on the ground that the prosecution did not establish an independent source for the eyewitness's in-court identification, as a matter of law, because the eyewitness failed to identify defendant in a non-suggestive lineup. Defendant also advances two arguments against his sentence. He claims that under CPL 400.15, and the New York and federal constitutions, he has a personal right to challenge a predicate felony statement, notwithstanding defense counsel's decision not to controvert the allegations therein, and the trial court denied him that right when it ignored his specific challenge to the prosecution's tolling allegations. Defendant also asserts that under the Supreme Court's decision in Erlinger v United States (602 US 821 [2024]), he is constitutionally entitled to have a jury determine whether his prior terms of incarceration sufficiently tolled the 10-year lookback period to encompass his prior conviction.
A.
Independent Source Claim
We reject defendant's challenge to his conviction because, assuming without deciding that the court erred in concluding there was an independent source to support the eyewitness's in-court identification, that error was harmless. Our standard of review is well settled. Since the alleged error is constitutional in nature, first, we "consider whether the evidence of [ ] defendant's guilt is overwhelming" (People v Ortega, 40 NY3d 463, 478 [2023], citing People v Mairena, 34 NY3d 473, 484 [2019]). If it is, we then decide whether there was "a reasonable possibility that the error might have contributed to defendant's conviction" (id. [internal quotation marks omitted]).
We conclude that the record evidence of defendant's guilt was overwhelming, even if the eyewitness testimony identifying defendant as the shooter is excised. Several witnesses testified that they observed an argument on the street between two men, which led to a shooting. The first victim testified that he and defendant, whom he identified in court, were arguing immediately before the shooting, as observed by these witnesses. Each witness described defendant as wearing the same jacket and pants, consistent with the testimony of the second victim, who also identified defendant in-court as a participant in the argument. The first victim also testified that he was shot shortly after he turned away from defendant. Several witnesses confirmed that they saw the same, and that the person arguing with the victim was the shooter.
Further, the compilation video depicts two people, including a person who matches the witnesses' description of defendant, engaged in an argument on a street where no one else could plausibly be the shooter. The DNA evidence on the jacket zipper found at the scene and the cell site evidence both placed defendant at the location of the shooting. Witnesses testified that the man arguing with the victim walked away from the scene following the shooting. The cell site evidence also established that after the shooting, defendant traveled to the acquaintance's home. And the acquaintance and his girlfriend testified to defendant's inculpatory statements that he shot someone, which was corroborated by the surveillance video showing two men standing outside the acquaintance's home, one of whom appearing to show off a gun. The eyewitness's testimony that she saw smoke rising from the shooter's pocket after he fired the gun further corroborated the girlfriend's testimony that defendant claimed "his pockets were smoking." Lastly, the remainder of the eyewitness's testimony includes her statement that [*4]she saw a man in a black jacket and red patterned shirt shoot at the victim after observing the men argue—a description of the events and the shooter's clothing corroborated by the other witnesses.
The record therefore contains overwhelming evidence of defendant's guilt. Given the quantity and quality of that evidence, even if some is circumstantial, there is no reasonable possibility that the eyewitness's in-court identification, which the prosecution barely referenced in summation and only as part of an argument that four other witnesses also identified defendant, contributed to his conviction. Thus, we reject defendant's request for a new trial, as the error he alleges was harmless.
B.
Defendant's Statutory Right to Controvert the Felony Statement Allegations
Turning to defendant's challenge to his sentence, "[t]he primary consideration of courts in interpreting a statute is to 'ascertain and give effect to the intention of the [l]egislature' " (Riley v County of Broome, 95 NY2d 455, 463 [2000], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a]). "Generally, the plain meaning of the statutory text is the best evidence of legislative intent" (People v Galindo, 38 NY3d 199, 203 [2022] [internal citations and quotation marks omitted]). We must also construe statutes "as a whole" and read their various provisions "together and with reference to each other" (People v Mobil Oil Corp., 48 NY2d 192, 199 [1979]). When the text is ambiguous, a statutory title may help clarify the legislature's intent (see Squadrito v Griebsch, 1 NY2d 471, 475 [1956]; see also McKinney's Cons Law of NY, Book 1, Statutes § 123 [a]).
CPL 400.15 is titled "Procedure for determining whether defendant is a second violent felony offender." A court must follow the procedure set forth in that provision in any case where it appears the defendant "has previously been subjected to a predicate violent felony conviction . . . and may be a second violent felony offender" (CPL 400.15 [1]). In such cases, the prosecution must file a statement "setting forth the date and place of each alleged predicate violent felony conviction [and, where applicable,] also shall set forth the date of commencement and the date of termination as well as the place of imprisonment for each period of incarceration to be used for tolling of the ten year limitation set forth" in Penal Law § 70.04 (1) (b) (iv) and (v) (CPL 400.15 [2]).[FN1]
CPL 400.15 (3), titled "preliminary examination," further states that:
"The defendant must be given a copy of [the alleged predicate felony conviction] statement and the court must ask [them] whether [they] wish[ ] to controvert any allegation made therein. If the defendant wishes to controvert any allegation in the statement, [they] must specify the particular allegation or allegations [they] wish[ ] to controvert. Uncontroverted allegations in the statement shall be deemed to have been admitted by the defendant."
The statute mandates a hearing "[w]here the defendant controverts an allegation in the statement and the uncontroverted allegations in such statement are not sufficient to support a finding that the defendant has been subjected to a predicate violent felony conviction" (CPL 400.15 [5]).
By its terms, CPL 400.15 establishes a procedure that the sentencing court must follow to determine a defendant's predicate felon status. Based on the full text of CPL 400.15 (3) and its placement in the predicate sentencing statutory scheme, we conclude that a court must ask the defendant personally if they wish to controvert any allegations in the prosecution's statement. A totality of factors support this conclusion. First, CPL 400.15 (3) requires that the defendant receive a copy of the statement and that the court ask them if they wish to controvert any allegation contained therein. This procedure thus mandates that the defendant personally has notice of the allegations against them and a corresponding opportunity to be heard. Second, CPL 400.15 (3) refers to the defendant using personal pronouns, which is a deviation from the rest of the statute's impersonal diction (see id. ["The defendant [*5]must be given a copy of such statement and the court must ask him whether he wishes to controvert any allegation made therein"] [emphasis added]).
Third, given the significant consequences of the decision to controvert and the information relevant to making that decision, it is unlikely that the legislature intended for defense counsel to be able to refuse to controvert in the face of the defendant's opposition, without any further inquiry by the court. Indeed, the failure to controvert results in an automatic sentence enhancement in the present case and in any future sentences and therefore has lifetime ramifications (see CPL 400.15 [8] ["Where a finding has been entered pursuant to this section, such finding shall be binding upon that defendant in any future proceeding in which the issue may arise"]). Further, sentence enhancements can be severe. For example, Supreme Court's conclusion that the prosecution established defendant's prior felony conviction, and its acceptance of the prosecution's proffered tolling calculations, subjected defendant to double the minimum term of incarceration. Relatedly, it is the defendant who has knowledge of the facts regarding their convictions and prior terms of incarceration essential to challenging the predicate felony allegations, including the periods that toll the 10-year lookback period.
These factors, considered together, make clear that the term "defendant," as written in CPL 400.15 (3), refers to the defendant personally. In these key ways, CPL 400.15 (3) differs from provisions of the CPL that refer to the "defendant" interchangeably with "the defense," without additional language suggesting that the legislature requires a court to direct its inquiry to the defendant.
Additionally, the Model Colloquy refers to the procedure in CPL 400.15 as an arraignment of the defendant and proposes a "script" for the court's direct inquiry to the defendant as to whether they wish to challenge the prosecution's predicate statement.[FN2] Although not controlling, the Model Colloquy aligns with our interpretation of CPL 400.15's procedural mandate.
As the right to controvert set forth in CPL 400.15 is personal to the defendant, the court erred in refusing to hear defendant on the matter, where he expressly objected to defense counsel's statement that he did not want to be heard. Defendant is entitled to an opportunity to explain his objection, and to a hearing, if appropriate, under CPL 400.15 (5).[FN3]
Finally, we do not consider defendant's argument that, in light of the intervening decision in Erlinger, he was constitutionally entitled to have a jury determine the tolling calculation. He will have an opportunity to raise that claim upon remittal if he so chooses, and, therefore, we decline to address it here.
Accordingly, the order of the Appellate Division should be modified by remitting to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed.
Order modified by remitting to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Rivera. Chief Judge Wilson and Judges Garcia, Singas, Cannataro, Troutman and Halligan concur.
Decided October 23, 2025

Footnotes

Footnote 1: Under Penal Law § 70.04 (1) (b) (iv), a defendant must ordinarily have been sentenced on the prior conviction not more than 10 years before they committed the current felony for that conviction to qualify as a predicate. However, section 70.04 (1) (b) (v) excludes from that 10-year lookback period "any period of time during which the [defendant] was incarcerated for any reason" between the time of commission of the previous and current felonies.

Footnote 2: See Arraignment of the Defendant on a Predicate Felony Statement, 
https://www.nycourts.gov/judges/cji/8-Colloquies/Arraignment-Predicate%20Statement.pdf (directing the court to ask the defendant, among other questions, "Do you wish to deny any allegation in the statement or to controvert the statement?").
Footnote 3: Since defendant has a statutory right to personally controvert predicate-felony allegations under CPL 400.15, we need not address whether the New York constitution grants defendant the same right (see People v Felix, 58 NY2d 156, 161 [1983] ["It is hornbook law that a court will not pass upon a constitutional question if the case can be disposed of in any other way"], citing Matter of Peters v New York City Housing Auth., 307 NY 519, 527-528 [1954] and McKinney's Cons Laws of NY, Book 1, Statutes, § 150]).